IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AIRBOSS RUBBER                    )
COMPOUNDING (NC), INC.,           )
                                  )
        Plaintiff,                )
                                  )
vs.                               )        Civil Action No. 1:12-CV-352
                                  )
KARDOES RUBBER CO., INC.          )
AND RAMEY F. THOMPSON,            )
                                  )
        Defendants.

## TRIAL BRIEF OF DEFENDANTS AND COUNTERCLAIM PLAINTIFFS KARDOES RUBBER CO., INC. AND RAMEY F. THOMPSON

Corena A. Norris-McCluney
N.C. Bar No. 29366
N. Dean Powell, Jr.
N.C. Bar No. 35511
1001 West Fourth Street
Winston-Salem, NC 27101-2400
Telephone: (336) 607-7300
Facsimile: (336) 607-7500


Thomas H. Christopher *(Pro hac vice)*
Georgia Bar No. 125512
Kathleen B. Dodd Barton *(Pro hac vice)*
Georgia Bar No. 443647
Suite 2800, 1100 Peachtree Street
Atlanta, GA 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
**KILPATRICK TOWNSEND & STOCKTON LLP**

*Attorneys for Defendants Kardoes Rubber Co., Inc. and Ramey F. Thompson*

Stephen A. Walsh *(Pro hac vice)*
Alabama Bar No. 9036-S81S
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Telephone: (205) 250-5000
Facsimile: (205) 250-5034
stephen.walsh@arlaw.com

**ADAMS AND REESE LLP**
*Attorney for Defendant Ramey F. Thompson*

Defendants and Counterclaim Plaintiffs Kardoes Rubber Co., Inc. ("Kardoes") and Ramey F. Thompson ("Thompson") (sometimes hereinafter collectively "Defendants") submit this trial brief to assist the Court in the trial of this case.

## I.   <u>INTRODUCTION</u>

This action was initially brought by Plaintiff AirBoss Rubber Compounding (NC), Inc. ("AirBoss") for alleged breach of a Confidentiality and Company Property Agreement ("Confidentiality Agreement" or "Agreement") by Mr. Thompson, alleged misappropriation of trade secrets by Mr. Thompson and Kardoes, alleged tortious interference with contract by Kardoes, and alleged unfair and deceptive trade practices by both Defendants. Kardoes filed a counterclaim for tortious interference with contractual relations and prospective commercial advantage, defamation, and deceptive trade practices by AirBoss. Mr. Thompson counterclaimed against AirBoss for defamation. AirBoss's claim against Kardoes for tortious interference with contract, and Kardoes's counterclaims for tortious interference and deceptive trade practices were each dismissed by Judge Eagles.

AirBoss's claims are essentially that its former employee, Mr. Thompson, and his current employer, Kardoes, misappropriated three AirBoss rubber formulas and used them to make rubber sold by Kardoes to certain customers in the off-the-road ("OTR") tire retread industry. Kardoes and Mr. Thompson deny that any misappropriation occurred, or that there are even trade secrets at issue. Defendants further assert that AirBoss's multiple statements to customers and potential customers that Kardoes and Mr. Thompson were selling "stolen technology" were defamatory.

1

## II.    STATEMENT OF FACTS

### A.    The Parties

Defendant Ramey Thompson is currently employed as the Sales Manager of Kardoes.  He has worked in the rubber compounding or mixing industry for over thirty years.  Mr. Thompson worked as a salesman for AirBoss from January 2007 through January 3, 2011.

Kardoes is a rubber compounder located in LaFayette, Alabama.  Kardoes's principal business is mixing rubber compounds for sale to manufacturers.  (Dkt. 7, Kardoes Counterclaim, ¶1; Dkt. 15, Reply to Kardoes Counterclaim, ¶1).  Natural rubber, synthetic rubber, and blends of the two are used in various rubber products.  However, the rubber must be mixed with a number of other ingredients, such as carbon black and sulfur, to create a workable product and to permit processing.  Working from formulas that it has developed, that are publicly available, or that a customer provides, Kardoes creates rubber compounds from these ingredients.  The compounds are then shipped to the appropriate manufacturer for their use.  For example, manufacturers use rubber compounds to make such products as new and retread tires, carpet backing, and conveyor belts.  (Dkt. 57-4, Declaration of Michael Cash, executed on May 15, 2013 ("Cash Decl."), ¶¶ 4-6).

Plaintiff AirBoss Rubber Compounding (NC), Inc., is a subsidiary of a Canadian corporation headquartered in Kitchener, Ontario.  The U.S. employees are theoretically employed under the North Carolina entity, but they are essentially directed by officers located in Canada.  (Dkt. 57-9, Deposition of Robert William Dodd, taken on November 16, 2012 ("Dodd Dep."), pp. 16:7-18:3).  AirBoss also mixes and sells rubber compounds

to manufacturers of rubber products. (Dkt. 23, Am. Compl., ¶2; Dkt. 29, Kardoes Answer to Am. Compl., ¶2).

## B. The Creation of Rubber Compounds by Kardoes in the 1990s for the Off-the-Road Tire Retread Industry

During the 1990s, Kardoes entered into discussions with certain manufacturers of retread tires for the "off-the-road" tire industry, including RDH Tire and Retread Co. ("RDH") and BR Retreading ("BR"), in an attempt to sell them product. In 1997, Kardoes prepared a formula for a compound to present to RDH, using a number of ingredients typically found in OTR formulas of this time. (*See* Dkt. 57-7, Deposition of Michael Wayne Cash, taken on December 6, 2012 ("Cash Dep."), p. 58:17-21; Dkt. 57-6, Declaration of R.J. Del Vecchio, executed on May 15, 2013 ("Del Vecchio Decl."), ¶ 29). RDH decided not to make a purchase at that point. (Dkt. 57-7, Cash Dep., pp. 179:7-180:6). Kardoes also developed a formula for BR in the 1990s. (Dkt 57-8, Deposition of Michael Wayne Cash, taken on May 1, 2013 ("Cash II Dep."), Dep. Ex. 3 at Def 00013045). The Kardoes formulas for RDH and BR were quite similar to typical and generally known tread formulas in the 1990s. A number of these formulas were published. (*See, e.g.*, Dkt. 57-6, Del Vecchio Decl., ¶¶ 12-18, 29-31).

## C. The Hiring Of Mr. Thompson By AirBoss And The Execution Of The Confidentiality Agreement

In late 2006, Mr. Thompson was hired by AirBoss, which sent him an offer letter in December. (Dkt. 57-12, Thompson Dep., p. 53:6-16; Dkt. 57-10, Deposition of Barbara Jane Lee, taken on November 16, 2012 ("Lee Dep."), p. 19:12-15, Dep. Ex. 1). Mr. Thompson signed the offer letter and returned it the next day. (*See* Dkt. 57-12, Thompson Dep., pp. 53:21-54:3; Dkt. 57-10, Lee Dep., p. 19:18-20). As indicated in the

3

offer letter, Mr. Thompson's start date with AirBoss was January 2, 2007. (Dkt. 57-12, Thompson Dep., Dep. Ex. 1 at Def 00012853-54; Dkt. 57-10, Lee Dep., p. 20:3-5). During this time, AirBoss began sending Mr. Thompson various employment-related documents for his signature. (Dkt. 57-5, Declaration of Ramey F. Thompson, executed on May 14, 2013 ("Thompson Decl."), ¶¶ 14-16).

In connection with his employment, Mr. Thompson signed a confidentiality agreement ("the Confidentiality Agreement") dated January 5, 2007. He has testified that he signed it while in his office in Georgia, (*see* Dkt. 23, Amended Complaint, ¶ 10; Dkt. 57-12, Thompson Dep., p. 72:3-15), and gave it to AirBoss when he visited its Canadian headquarters on January 8, 2007. (Dkt. 57-12, Thompson Dep., pp. 65:21-66:1). The Agreement only has a signature line for Mr. Thompson; there is no signature line for AirBoss. AirBoss's Amended Complaint even alleges that Mr. Thompson signed the Agreement on January 5, 2007. (Dkt. 23, Am. Compl., ¶ 10). AirBoss claims that he signed the Agreement in Canada, even though Mr. Thompson was not in Canada on January 5, the date on the Agreement. Expense reports produced by AirBoss in discovery and other documents also confirm that Mr. Thompson was not in Canada until after the date of the Agreement. (Dkt. 57-16, Declaration of Thomas H. Christopher, executed on May 15, 2013 ("Christopher Decl."), ¶ 6 (referring to Ex. A, AirBoss001588-93); Dkt. 57-12, Thompson Dep. 65:7-66:1, Dep. Ex. 4 at Def 00013040-41).

### D.     Kardoes Hires Mr. Thompson and He Resigns from AirBoss

Kardoes hired Mr. Thompson as a salesman in late 2010. (Dkt. 57-7, Cash Dep., Dep. Ex. 2 at response to Interrogatory No. 1). When Mr. Thompson resigned from AirBoss, he agreed to an exit interview with the Personnel Manager Barbara Lee, but AirBoss allowed the matter to drop. (Dkt. 57-10, Lee Dep., pp. 35:18-36:22; Dkt. 57-12,

4

Thompson Dep., pp. 96:15-98:13; Dkt. 57-13, Deposition of John Tomins, taken on November 15, 2012 ("Tomins Dep."), p. 96:8-14). Mr. Thompson returned his computer and other equipment, but, because there was personal information on the computer, it was at some point backed up to an external hard drive and at a later point was transferred to a computer which Mr. Thompson retained. (Dkt. 57-12, Thompson Dep., pp. 22:18-20, 25:14-26:8; Thompson Dep., Dep. Ex. 6, Defendant Ramey F. Thompson's Responses to Plaintiff's First Set of Interrogatories to Defendant Ramey F. Thompson, No. 2, dated September 25, 2013, attached as Exhibit 1).

Mr. Thompson has denied receiving any request that he search his home for documents and send them back to AirBoss. (Dkt. 57-12, Thompson Dep., pp. 95:23-96:13; Exhibit 1, Thompson Dep., Dep. Ex. 6, No. 2). AirBoss Vice President, John Tomins also had no memory of such a request during his deposition. (Dkt. 57-13, Tomins Dep., pp. 96:24-97:8, Dep. Ex. 5). But at a subsequent deposition months later, Mr. Tomins claimed to have had his recollection "refreshed" and remembered asking that papers be sent back. (Dkt. 57-14, Deposition of John Tomins, taken on April 23, 2013 ("Tomins II Dep."), pp. 61:12-62:24, 118:5-119:24).

During his four-year AirBoss employment, Mr. Thompson had used his home as an office and in fact had several boxes of work papers acquired over that time. Since he received no request for these documents, and no reminder of the existence or terms of the Agreement, he did not immediately search his home to find them and send them back when he left AirBoss. (Exhibit 1, Thompson Dep., Dep. Ex. 6, No. 2). However, subsequent to the filing of this lawsuit, all such documents were voluntarily returned to AirBoss by Mr. Thompson and he has not retained any copies thereof.[1]

---

[1] Lawyers for Defendants have retained copies solely for the purposes of the litigation.

The Confidentiality Agreement signed in 2007 contains the following language: "I agree that no company property….may be removed from the company premises without permission from an authorized person and will be returned without copying upon termination of my employment" (Dkt. 23, Am. Compl., Ex. 1, ¶ 5). AirBoss claims that, although there was no removal of any property from company premises, this sentence applied to Mr. Thompson. However, AirBoss did not make any effort to remind him of the Confidentiality Agreement signed four years before his resignation, or to point out this sentence in it. In fact, it made no reference to the existence or contents of any such agreement for over a year after the resignation and never made a request for the documents. (Dkt. 57-14, Tomins II Dep., Dep. Ex. 5). They were voluntarily turned over to counsel after commencement of the litigation without any such request having been made. (Exhibit 1, Thompson Dep., Dep. Ex. 6, No. 2; Dkt. 57-14, Tomins II Dep., Dep. Ex. 5).

Within the business papers collected over four years were certain documents provided to Mr. Thompson which showed ingredients and quantities of various products. There is no evidence that he collected these materials in preparation for his change in employment. AirBoss has alleged that it is possible to reproduce rubber formulas from those documents, though AirBoss has not provided any direct evidence that Kardoes did in fact reproduce those rubber formulas from any AirBoss documents. (Dkt. 57-11, Deposition of Jerry J. Leyden, taken on February 19, 2013 ("Leyden Dep."), Dep. Ex. 1, pp. 4-5).

**E.**    **Kardoes Makes Sales to Customers RDH and BR**

When he went to work for Kardoes, Mr. Thompson identified the off-the-road retread market as an opportunity for the company. (Dkt. 57-12, Thompson Dep., Dep.

Ex. 1 at Def 00012942-44). He approached his former customers RDH and BR and obtained permission to present samples and compete for business with them. (Dkt. 57-12, Thompson Dep., pp. 201-206, Dep. Ex. 1 at Def 00012918.).

Mike Cash of Kardoes, who had decades of experience in preparing compound formulas, began to develop the formulas needed for RDH and BR products. (Dkt. 57-4, Cash Decl., ¶ 3). In April, 2011, he developed a formula which was similar in most respects to the 1997 version of Kardoes's RDH formula. (Dkt. 57-4, Cash Decl., ¶ 7; Dkt. 57-6, Del Vecchio Decl., ¶ 29). However, Mr. Thompson suggested the use of one ingredient, a particular grade of carbon black that was common in the off-the-road segment of the industry, and that he had known about before going to work for AirBoss. (Dkt. 57-12, Thompson Dep., pp. 159:22-160:20, Dep. Ex. 1 at Def 00012942).

As is typical with the sale of rubber compounds, Kardoes made a series of tests and adjustments of the formulas. The formulas continued to have many of the ingredients from the formulas of the 1990s, but some changes were made. The last version of the 2011 formulas had many of the ingredients that were in the original Kardoes 1997 formulas. (Dkt. 57-6, Del Vecchio Decl., ¶ 29). They had some ingredients that were also contained in the AirBoss formulas for RDH (AirBoss 5167), as the AirBoss formula and the 1997 Kardoes formula had many of the same ingredients. (Dkt. 57-6, Del Vecchio Decl., ¶¶ 34-38). However, the 2011 Kardoes formulas had key ingredients that were not contained in the AirBoss formulas, and the AirBoss formulas had ingredients that never appeared in any Kardoes OTR formula. (Dkt. 57-6, Del Vecchio Decl., ¶¶ 34-35, 39).

AirBoss claims to have become suspicious that Defendants misappropriated its formulas and had samples, allegedly from Kardoes, tested by a laboratory. Although the

report of the tests showed differences in the formulas, ( Dkt. 57-6, Del Vecchio Decl., ¶¶ 22-24, 26 & 27). AirBoss brought this action for misappropriation.[2]

AirBoss claims that the trade secrets allegedly misappropriated were three formulas used for the customers RDH and BR, and that it is the exact ingredients and exact quantities of its formulas that are the trade secrets. (Dkt. 57-14, Tomins II Dep., pp. 12-13, 28-30, 32-36). No Kardoes formula, or test of an alleged sample of Kardoes product, contain the exact same ingredients or quantities as any of the AirBoss formulas. (*See e.g.,* Dkt. 57-6, Del Vecchio Decl., ¶¶ 33-37, 42-43). Indeed, the Kardoes formulas contain significant differences. (*See e.g.,* Dkt. 57-6, Del Vecchio Decl., ¶¶ 33-37, 42-43, 49). Further, all of the ingredients of the AirBoss formulas are typical and commonly known. (Dkt. 57-6, Del Vecchio Decl., ¶¶ 18-24, 28, 34-35, 37, 49). For example, although AirBoss claims that its trade secrets are the exact combination of ingredients with the exact quantities, it has focused most of its attention on one grade of the ingredient carbon black in one of the three formulas as having been misappropriated. Discussion of the value of that grade of carbon black was widely published and the exact grade was contained in numerous published formulas as long ago as the 1990s. With regard to the AirBoss RDH formula, for example, all but two of the ingredients were also in Kardoes' formulas before 2011, and one of those is not used in the current Kardoes formula. (Dkt. 57-6, Del Vecchio Decl., ¶ 39). The remaining ingredient is the grade of carbon black suggested by Mr. Thompson, about which he had knowledge before he worked at AirBoss. (Dkt. 57-6, Del Vecchio Decl., ¶ 39; Dkt. 57-12, Thompson Dep., pp. 159:22-160:20, Dep. Ex. 1 at Def 00012942). In fact, AirBoss's RDH formula is

---

[2] The laboratory report did claim that "one should seriously question whether [the samples tested] ... were independently developed." The lab was apparently unaware that Kardoes had similar formulas from the 1990s. (*See* Dkt. 57-11, Leyden Dep., Dep. Ex. 2).

almost identical to a typical, published formula from the 1990s.  (Dkt. 57-6, Del Vecchio Decl., ¶¶ 18-21).

## III.   DISCUSSION OF RELEVANT ISSUES

### A.   The Breach of Contract Claim Is Dependent Upon the Factual Issue of Where the Contract Was Signed.

Defendant Thompson moved for summary judgment on the breach of the Confidentiality Agreement claim on the grounds that the Agreement is invalid.  Judge Eagles ruled that this issue was dependent upon a factual determination which, she concluded, would have to be made by the jury.

The Confidentiality Agreement is silent as to choice of law.  In such a situation, the validity and interpretation of a contract is "governed by the law of the place where the contract was made."  *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980).  The North Carolina Supreme Court has held that a contract is formed where the last act was done by either of the parties essential to a meeting of the minds.  *Fast v. Gulley*, 271 N.C. 208, 211, 155 S.E.2d 507, 510 (N.C. 1967).  Until the last act was done, there was no contract:  "upon its being done at a given place, the contract became existent at the place where the act was done.  Until then there was no contract."  *Id.*

Defendants contend that the Confidentiality Agreement was signed in Georgia and that this was the last act necessary to achieve a meeting of the minds.  AirBoss has contended that the agreement was signed by Mr. Thompson in Canada, despite the fact that Mr. Thompson was in Georgia on the date shown on the Agreement.  Mr. Thompson's signature is the only one on the Agreement.  Judge Eagles indicated that the jury would have to resolve this issue.

9

If the issue is resolved in Defendant's favor that the Agreement was signed in and thus formed in Georgia, then the Agreement is invalid. The confidentiality provisions in the Confidentiality Agreement have no time limitation. Under Georgia law in effect when Mr. Thompson signed the Agreement, a confidentiality agreement lacking a time limitation is unenforceable as a matter of law.[3] *Howard Schultz & Assoc. of the S.E., Inc. v. Broniec*, 236 S.E.2d 265, 270 (Ga. 1977); *Stahl Headers, Inc. v. MacDonald*, 447 S.E.2d 320, 324 (Ga. Ct. App. 1994); *U3S Corp. of Am. v. Parker*, 414 S.E.2d 513, 517 (Ga. Ct. App. 1991). Further, under Georgia law in effect in the relevant time, a court cannot save an unenforceable confidentiality agreement ancillary to an employment relationship by "blue-penciling" it. If it was invalid, it cannot be reformed and enforced. *MacGinnitie v. Hobbs Grp, LLC*, 420 F.3d 1234, 1241-42 (11th Cir. 2005).

As a result, it appears necessary for the Court to establish a procedure for the resolution of this matter. Defendants suggest that the jury verdict form be designed to obtain the jury's finding on this issue, with instructions to find for Defendants on the breach of contract claim if the preliminary matter of signature is resolved in favor of Defendants.

### B. AirBoss's Claim Should Be Limited to the Assertion That Three of Its Rubber Formulas Were Misappropriated

AirBoss has asserted in this case that Defendants misappropriated three of its rubber formulas. However, AirBoss's witnesses have also criticized Mr. Thompson for not collecting and returning to it the business papers which had accumulated in Mr. Thompson's home office. (Tomins Dep., p. 180: 7-23, attached as Exhibit 2). As

---

[3] Although the Georgia law changed in May 2011, the change was not retroactive. *Becham v. Synthes USA*, 482 F. App'x 387, 389 (11th Cir. 2012).

noted, Mr. Thompson denies receiving any such request and has in fact returned the documents. Although Defendants concede that AirBoss may point to Mr. Thompson's retention of the documents in an attempt to prove that its rubber formulas were misappropriated, AirBoss has clearly limited its claims to the issue of the misappropriation of the three formulas.

In its First Interrogatories to AirBoss, Kardoes asked:

> Identify, state, and fully describe the formulae and <u>any other trade secrets</u> or confidential information referred to in Paragraphs 28, 23, 22, 21, and 19 of the Complaint <u>or about which you are suing in this case</u>.

AirBoss's response was:

> At issue are three rubber compounds sold by AirBoss Rubber and identified as 5126, 5226 and 5267.

(Dkt. 78-3, Second Declaration of Thomas H. Christopher, executed on June 5, 2013 ("Christopher II Decl."), Ex. C, response to Interrogatory No. 1) (emphasis supplied).

In its corporate representative deposition, Defendants specifically sought information as to what claims were still at issue. AirBoss again expressly limited its claims to misappropriation of three rubber formulas. (Dkt. 57-14, Tomins II Dep., pp. 9-10, 55-57).

Counsel for Defendants specifically relied upon these admissions. Defendants did not pursue deposition questions about what other claims might exist, including what evidence might support them, and what damages might have resulted from them. AirBoss should be held to the limitations which it placed upon its own case and not be permitted to litigate any other claims.

11

### C. AirBoss Cannot Make Out a Claim for Misappropriation of Trade Secrets Or Related Claims

As noted above, Defendants contend the evidence shows that they did not take or use the AirBoss formulas at issue. This would, of course, defeat AirBoss's claims. However, those claims should also be denied because the formulas are not in fact trade secrets. Defendants assert the evidence shows that the information in AirBoss's formulas was commonly known and that the formulas were in fact virtually identical to publically available formulas in the 1990s. (Dkt. 57-6, Del Vecchio Decl. ¶¶ 12-21, 23, 24, 26-28).

Information that is generally known cannot be provided trade secret protection. *See* N.C. Gen. Stat. § 66-152(3) (defining trade secret as requiring that the information "derive[ ] independent actual or potential commercial value from *not being generally known or readily ascertainable* through independent development or reverse engineering") (emphasis added); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 469-470, 579 S.E.2d 449, 454 (2003) (declining to find trade secret protection because examples given were either "generally known in the industry, are process dependent so as to preclude misappropriation, or are readily ascertainable by reverse engineering"); *Thortex, Inc. v. Standard Dyes, Inc.*, 177 N.C. App. 814, 2006 WL 1532136, at * 4 (2006) (dismissing complaint on pleadings for failing to show that purported trade secret was not generally known).[4]

---

[4] Courts have applied additional factors to determine whether information should be treated as a trade secret. *See, e.g., Combs & Assoc., Inc. v. Kennedy*, 147 N.C. App. 362, 555 S.E.2d 634 (2001). The arguments herein focus generally on issues that the purported trade secret information is well known outside of AirBoss and that the information could have easily been properly acquired and duplicated by others.

In particular, chemical formulas and manufacturing processes that are commonly known are not entitled to such protection, and alleged misappropriation of them will not support a misappropriation of trade secret claim. *See, e.g.*, *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 155, 555 S.E.2d 281, 292 (2001). For example, the court found the absence of a trade secret in *Glaxo, Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1300 (E.D.N.C. 1996), *aff'd*, 110 F. 3d 1562 (Fed. Cir. 1997) because the alleged trade secret was "not so distant from the grasp of chemists experimenting with the substance that it may be declared not readily discoverable." *Id.* at 1302. Here the alleged trade secrets are "not so distant" from what chemists could have discovered. In fact, they were discovered, were generally known, and were known by Defendants.

Further, trade secret law does not require an individual to "forget" information that he had when he started working for a new employer. *See, e.g., Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 34 (1944) ("The experience, knowledge, memory and skill, which [employee] gained while there employed, he had a right to use to his own advantage"); *Thomas v. Best Mfg. Corp.*, 218 S.E.2d 68, 70 (Ga. 1975) ("[A] man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer…") (quoting *Williston on Contracts* § 1646, p. 4627). Mr. Thompson had decades of rubber experience before going to work for AirBoss, including as general manager and as president of a rubber company (Dkt. 57-5, Thompson Decl., ¶ 10), and he was not required to forget that knowledge simply because he went to work for AirBoss. *Pittsburgh Cut Wire*, 350 Pa. at 34; *Thomas*, 234 Ga. at 788-789; *see also Asheboro Paper and Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 677 ("Under North

Carolina law, customer information maintained in the memory of a departing employee is not a trade secret.")

It was acknowledged that the ingredients in the AirBoss formulas were common. (Dkt. 57-11, Leyden Dep. pp. 75-76). While a trade secret can exist in a unique combination of otherwise known components, the combination must differ materially from other methods revealed by the prior art and represent a valuable contribution attributable to independent efforts of the one claiming to have conceived the combination. *See e.g., Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913, 1991 WL 54118 at *3 (4th Cir. 1991) (citing *Restatement (Second) of Torts*); *Glaxo*, 931 F. Supp. 1280, 1300 (E.D.N.C. 1996). Defendants assert that the AirBoss formulas do not differ materially and do not meet this standard.

AirBoss's claim will also fail because the formulas used by Kardoes were independently developed by it. Kardoes had developed formulas for the same customers at issue in the 1990s. As Defendants' expert has noted, its current formulas are merely a natural development from those earlier formulas. (Dkt. 57-6, Del Vecchio Decl., ¶¶ 29-31, 50).

### D.    Kardoes and Mr. Thompson Will Be Entitled to Recovery on Their Defamation Claims

AirBoss has admitted making accusations to a number of current and potential customers that Kardoes and Mr. Thompson stole AirBoss's technology. (Dkt. 57-13, Tomins Dep., pp. 124-126, 132-139, Dep. Ex. 12). Under North Carolina law[5], "[a]mong statements which are slanderous per se are accusation of crimes or offenses involving

---

[5] This North Carolina rule does not differ significantly from the rule in various states with some connection with this case. *See e.g., Travis v. Bacherig*, 7 Tenn. App. 638 (1928); O.C.G.A. § 51-5-4; *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781 (Ky. 2004); *Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887 (Ala. 2004); *Skjonsby v. Ness*, 221 N.W.2d 70 (N.D. 1974).

moral turpitude, [and] defamatory statements with respect to [the plaintiff's] trade or profession. . . ." *Gibby v. Murphy*, 73 N.C. App. 128, 131, 325 S.E.2d 673, 675 (1985).

Accusing someone of stealing is accusing them of a crime or offense involving moral turpitude that constitutes slander per se. *See e.g., Kehrer v. Fields*, No. 5:11-cv-260-FL, 2011 WL 6965714 (E.D.N.C. Nov. 21, 2011); *Haywood v. Sears, Roebuck & Co.*, No. 7:94-cv-106-BRZ, 1996 WL 33673593 (E.D.N.C. July 19, 1996). Indeed, even such accusations as "engaging in unethical and morally repugnant dealings with employees," having one's "hand in the cookie jar," or writing a bad check can be slander per se. *See Eli Research, Inc. v. United Commc'ns Grp., LLC,* 312 F. Supp. 2d 748, 762-3 (M.D.N.C. 2004); *Harris v. Temple*, 99 N.C. App. 179, 183, 392 S.E.2d 752, 754 (1990); *Roberts v. Sears, Roebuck & Co.*, No. 1:99cv75-T, 2000 WL 33422750 (W.D.N.C. Apr. 30, 2000).

Further, AirBoss clearly defamed Mr. Thompson and Kardoes in their business. "It is well settled that false words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable, and words so uttered may be actionable per se." *Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955). In fact, "[d]efamation of this class ordinarily includes charges made by one trader or merchant tending to degrade a rival by charging him with dishonorable conduct in business." *Id.*

Further, a false written statement that "tends to subject one to ridicule, contempt, or disgrace" can be libel per se. *Eli Research, Inc.,* 312 F. Supp. 2d at 761. The defamatory email from AirBoss to RDH (Dkt. 57-13, Tomins Dep., Dep. Ex. 12) clearly falls within this category.

When a party proves defamation *per se*, there is "a conclusive presumption of legal injury and general damage, entitling plaintiff to recover nominal damages at least without specific allegations or proof of damages." *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278, 284, 182 S.E.2d 410, 414 (1971); *see also Gibson v. Mutual Life Ins. Co. of N.Y.*, 121 N.C. App. 284, 289, 465 S.E.2d 56, 59 (1996). In addition, in a defamation *per se* case, under the appropriate circumstances, courts have held that a plaintiff may recover "presumed damages" without proof of actual damages. *WMC, Inc. v. Weaver*, 166 N.C. App. 352, 361, 602 S.E.2d 706, 712 (2004) (citing *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 119, 1142 (7th Cir. 1987). A plaintiff may be compensated for presumed damages which include "loss of reputation or standing in the community," "mental or physical pain and suffering, inconvenience, or loss of enjoyment which cannot be definitively measured in monetary terms." ). *Mann v. Swiggett*, No. 5:10-CV-00172-D, 2012 WL 5507255 at *4 (E.D.N.C. Oct. 9, 2012).

Punitive damages are recoverable for defamation under appropriate circumstances. *Hien Nguyen v. Taylor*, 723 S.E.2d 551, 560 (N.C. App. 2012). In North Carolina, the courts look at the following factors in determining whether punitive damages should be awarded:

a.   The reprehensibility of the defendant's motives and conduct.

b.   The likelihood, at the relevant time, of serious harm.

c.   The degree of the defendant's awareness of the probable consequences of its conduct.

d.   The duration of the defendant's conduct.

e.   The actual damages suffered by the claimant.

f.      Any concealment by the defendant of the facts or consequences of its conduct.

g.      The existence and frequency of any similar past conduct by the defendant.

h.      Whether the defendant profited from the conduct.

i.      The defendant's ability to pay punitive damages, as evidenced by its revenues or net worth.

N.C. Gen. Stat. Ann. § 1D-35.

### E.    Confidentiality of Potential Exhibits

A number of documents have been designated by the parties as highly confidential and thus, under the Protective Order entered by the Court, they have not been shared with named opposing parties.[6]  While Defendants were agreeable to this procedure in the discovery phase of the case, they submit that the named Defendants should not be prohibited from reviewing the AirBoss formulas in preparation for and at trial.

The nature and contents of the AirBoss formulas is critical to the resolution of the case.  (*See* Dkt. 57-1, pp. 3-17 and Dkt. 98, pp. 1-7).  Defendants would be deprived of adequate opportunity to litigate the case if they are unable to review these critical documents.  On the other hand, AirBoss would not be prejudiced as it alleges that Defendants have seen this information.  (*See* Dkt. 23, ¶¶ 34, 36, and 42).

The Consent Protective Order entered by the Court on August 28, 2011 states:

a party may review a document designated "Highly Confidential" that the party is alleged by the producing party to have seen before, but may do so only in the presence of counsel and may not retain a copy outside the presence of counsel.

(Dkt. 31, Consent Protective Order, August 28, 2012, ¶ 7, p. 9).

It also states:

---

[6] Counsel have, of course, had access to these documents.

8. Notwithstanding the foregoing, if a party asserts in good faith that its ability to properly litigate the case is prejudiced by its inability to review a document designated "Highly Confidential," the parties shall confer in good faith to attempt to resolve the matter and, if agreement cannot be reached, the matter may be taken up with the Court.

(*Id.* at ¶ 8, p. 9).

The Supplemental Protective Order of August 28, 2012 states:

To the extent that any party would seek to seal or otherwise restrict access to an exhibit or other document introduced during a hearing, trial, or other court proceedings, the party must make a separate motion in that regard to consideration by the court conducting the proceedings, supported by sufficient justification therefore.

(Dkt. 32, Supplemental Protective Order, August 28, 2012, p. 4).

The content of the formulas is central to the case. If the parties cannot reach an agreement to provide Kardoes' corporate representative and Mr. Thompson (where permission has not already been provided) with access to the formulas at issue, Defendants expect to raise the matter with the Court, and should be granted permission to show them the formulas.[7]

## IV.     **CONCLUSION**

The issue of where the Confidentiality Agreement was signed is critical to the question of whether that Agreement is valid and enforceable. Under Judge Eagle's rulings, that issue will have to be resolved by the jury. Whether or not the contractual claims survive, AirBoss's claims in the case should be limited to alleged misappropriation of the three formulas that it identified. Defendants expect the evidence to show that they did not misappropriate those formulas and that in fact they are not protectable trade secrets. Further, Defendants should be entitled to actual and punitive

---

[7] Under the terms of the Protective Order, Mr. Thompson is currently authorized to review certain documents containing the formulas, as it is claimed they were in his possession.

damages due AirBoss's defamation of them in falsely claiming that Defendants stole AirBoss's technology. These damages will include actual and presumed damages for loss of reputation and mental suffering.

Respectfully submitted,

/s/ N. Dean Powell, Jr.
N.C. Bar No.  35511
Corena A. Norris-McCluney
N.C. Bar No. 29366
1001 West Fourth Street
Winston-Salem, NC  27101-2400
Telephone: (336) 607-7300
Facsimile:  (336) 607-7500
cnorris-mccluney@kilpatricktownsend.com
dpowell@kilpatricktownsend.com

Thomas H. Christopher (*Pro hac vice*)
Georgia Bar No. 125512
Kathleen B. Dodd Barton (*Pro hac vice*)
Georgia Bar No. 443647
Suite 2800, 1100 Peachtree Street
Atlanta, GA   30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555
tchristopher@ktslaw.com
kbarton@ktslaw.com

KILPATRICK TOWNSEND & STOCKTON
LLP
*Attorneys for Defendants Kardoes Rubber Co.,*
*Inc. and Ramey F. Thompson*

Stephen A. Walsh (*Pro hac vice*)
Alabama Bar. No. 9036-S81S
1901 Sixth Avenue North, Suite 3000
Birmingham, AL  35203
Telephone:  (205) 250-5000
Facsimile:  (205) 250-5034
stephen.walsh@arlaw.com

ADAMS AND REESE LLP
*Attorney for Defendant Ramey F. Thompson*

20

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AIRBOSS RUBBER COMPOUNDING       )
(NC), INC.,                      )
                                 )
                    Plaintiff    )
                                 )
v.                               )          CIVIL ACTION
                                 )          NO. 1:12-cv-352
KARDOES RUBBER CO., INC. and     )
RAMEY F. THOMPSON,               )
                                 )
                    Defendants.  )

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> Charles George
> Samuel A. Slater
> Wyrick Robbins Yates & Ponton LLP
> Post Office Drawer 17803
> Raleigh, NC   17803
> cgeorge@wyrick.com
> sslater@wyrick.com

> /s/ N. Dean Powell, Jr.
> N.C. Bar No.  35511
> 1001 West Fourth Street
> Winston-Salem, NC  27101-2400
> Telephone: (336) 607-7300
> Facsimile:  (336) 607-7500
> cnorris-mccluney@kilpatricktownsend.com
> **KILPATRICK TOWNSEND & STOCKTON LLP**
> Attorneys for Defendants Kardoes Rubber Co., Inc. and Ramey F. Thompson

21